I'm Dan Swanson representing the appellant, Jostens, Inc. If I may, I'd like to reserve five minutes for rebuttal time. May it please the Court, we are here asking this Court today to reverse the judgment of the District Court below. A judgment rests on a finding of a Section 2 and a Section 17-200 violation, in turn predicated on the Section 2 violation, that rests on one and only one aspect of conduct, and that is the use of renewal options in the so-called TSP agreements between Jostens and the public schools of Southern California. Now it is our position that that judgment, the District Court's decision, amounts to a direct condemnation of the very significant and legitimate interests of the schools of Southern California. There is less in authority on California law than the California Supreme Court has declared, and we cited the Bright case to this effect in our reply brief at pages 5 and 6, that the school is not a marketplace and school officials have authority to control commercial conduct on school premises. Now the schools are, I believe it is established without dispute in the briefing thus far, a political subdivision of the State of California. They are a state agency of a sovereign state. Nonetheless, the District Court below viewed the role of the schools in this market as a somewhat troubling and even distorting factor. We would submit that the District Court failed as a matter of law to credit the significance of the interests that were advanced by the schools, subject to properly delegated authority by the State of California, and that those interests apply at least to independent bases for reversal of the decision below. One is pursuance to the state action immunity doctrine under Parker v. Brown, and the other basis for reversal is the legitimate business justification doctrine under Section 2, as reflected in a number of decisions of this Court. Most recently, very recently, in the Paladin v. Montana Power case, this Court affirmed summary judgment on a Section 2 and, of course, a Section 1 claim as well, holding in part that the 5-year contracting practice at issue there was justified by legitimate business considerations, in particular, the fact that 5-year contracts eliminated the transactions cost of renegotiating agreements on a yearly basis. And this Court expressly held that such efficiencies are pro-competitive. Here we are not talking about multiyear contracts. We are talking about TSP agreements that had options for renewal that were at the option of the school district itself. And those efficiencies of having the option to renew and not having to renegotiate or to shift or change the relationship are options that we would suggest under Paladin are equally pro-competitive. Now, I've spoken just briefly, and I will return to these topics if I have time, about state action immunity and legitimate business justification. But under this Court's precedence, most recently in the Metronet decision, a defendant is not even put to the burden of justifying its conduct unless the plaintiff makes a showing, in the first instance, of some significant anti-competitive impact on the market. And we would submit that the record below does not qualify as supporting a finding of such a significant anti-competitive impact on the opportunities of competing vendors of graduation products, sufficient even to justify shifting the burden of proof on business justification. To come to the point, could the school district shift at any time they wanted? I'm sorry, Judge Fernandes. Could the school district shift, shift vendors if they wished to? Absolutely. The finding of the district court below was that these TSP agreements were not binding legally on the school districts. It wasn't the school district, though. It was the individual schools. And the schools as well. I meant that, the schools. Could the schools shift if they so desire? That is correct. The schools or the school districts. The schools, of course, are the arms of the school districts. School employees are the employees of the school districts. State law allows the school districts to delegate all of their powers and authorities to their teachers and principals. How do you delegate a power to various schools which act in different ways? Well, schools will act in different ways when they are confronted by different vendors seeking access to school campus. The overriding... It's not the same as if the school district entered into an agreement. Well, if a school enters into an agreement with authority, then I would submit, in fact, it is acting on behalf of the school district. All of the TSPs that are in evidence recite that they are signed by school officials who have delegated school powers and who are authorized to enter into those agreements. There was no question, and the district court made no finding below, that any of the school officials who took the actions that ended up being intertwined with the challenge in this case were acting ultra vires or were otherwise without authority. No, it's not ultra vires, but it's one thing for the state to do something. It's another thing for the school district to do something. It's another thing for individual schools to do something. It's another for a school official to do something. They're not identical. They are not. And the state, in its authorizing statutes, authorizes school districts to take certain actions. In the same statutes, Section 35, 161 of the Education Code, the state, let's say, legislature authorizes school districts to delegate all of those powers to the schools who actually operate and undertake the day-to-day activity of educational activity, who actually carry out the educational mission. It is, I think, an undeniable fact that the schools and the employees and the principals and the teachers who work for them are the representatives of school districts. School districts have no other powers. But they're not acting on behalf of the school districts. They're acting on behalf of the school, because one's making an exclusive agreement with A and another's making an exclusive agreement with B, and they're acting for the individual schools, not for the district. But if the question is, are the schools not authorized to do what they do? Nobody's saying they're not authorized. I'm just saying we can't keep saying it's the district that did this. It's the individual schools which did it, acting on their behalf. They're authorized to do it. Yeah, I guess you're right. They're authorized to act not for the district, but to act for the school and to make independent decisions as to what they want for that school. The schools, to the extent that they have authority to do what they've done, are acting under State law, and the State law allows them to exercise the powers that are delegated by the State legislature to the school districts. Obviously the State law didn't say you can go out and violate the antitrust laws. Well, State law actually says very little about the activity of schools and antitrust laws. The State of California, of course, exempts schools and other public institutions from its State antitrust laws. They're not subject, the Cartwright Act, they're not subject to Section 17200. And one of the interesting things, and I think very unfortunate results of the district court's reasoning, is that the district court's reading of one of the statutes that supplies the policies that underlie State action immunity here, its reading of that statute suggests that it could never, ever be invoked for any conduct by any school or any school district, no matter how intertwined with the educational mission of that school, to supply the necessary predicate for finding a State action immunity. And that doesn't make a lot of sense. It doesn't make sense that the State legislature in 1976, acting with constitutional authority, would have shifted the entire scheme of California law from one where school districts and schools were protected from State antitrust liability and surely from Federal antitrust liability to the extent that they were following State policy, to an entirely new scheme where they were completely at risk of being found liable under the Federal antitrust laws, although not the State antitrust laws. The whole issue of justification, obviously the issue of State action is one this Court addresses de novo, but the, and we would submit resolves the entire controversy, but the issue of business justification is only reached if there is, in fact, some significant anti-competitive impact that limits the opportunities of competing schools in any way that they do not limit their own. Kennedy. Well, they don't limit them legally, but isn't there a finding that that's the practical effect of those agreements? The finding of the district court was that there was a moral dimension to these agreements that led schools to whip them out and seize upon them as a, quote, unquote, convenient excuse. So the practical effect, practical effect, not the legal effect, is that they were considered or treated as if they were given the effect of being binding agreements, even though they were not legally binding. They had the same impact as a legally binding agreement would have had. I would say, I understand the question, Your Honor, and Judge Reinhart, I think that was not the specific finding of the district court below on the facts. What the district court found was that whether or not a school district had a TSP, if they had a relationship, if a competing vendor came to the school, the school would exercise a state keeping authority to either keep the vendor out or let it in. And what Judge Carter found was that there were at least three circumstances where the schools would let the competing vendor in and, in fact, throw the incumbent out the window. One of them was if the incumbent had significantly raised prices. Another one was where the incumbent was otherwise falling down on the job, wasn't satisfying the expectations of the school. And a third situation was where the competing vendor came in with a better package, a superior package, better prices, products and service. So this was a meaningless agreement, these STPs. It had no real effect, did it? I think it had no anti-competitive effect. Well, what practical effect did it have? Well, it had very reasonable practical effects. On the one hand, Jostens was very interested to have its sales representatives use them because they were a good way to force the sales representatives to do what the agreement said that they should do, which is to come to the school every year and review products, prices and services. They'd have to do that if you only had a one-year contract and they wanted a second year. Wouldn't Jostens tell its representatives, after the contract expires, don't just let it go? We want it the next year, too? Is that something that the representatives would not have understood? Well, I think Jostens found that it needed to incentivize its representatives to do the job that Jostens wanted to perform for the schools because, as the record shows, schools place an enormous premium. Wouldn't it be more of an incentive if you didn't have any contract, that you only had a one-year contract? Wouldn't there be a complete incentive to go and get the next contract? Oh, I think there is a complete incentive here. These contracts are not legally binding. The schools are not obligated to buy anything. The students are not obligated to buy anything. Well, that's why what does this add to the incentives the representative would have had? He said this was a great incentive for the representatives to go back to the next year. Yes, it is Jostens' policy that its representatives use these contracts, tell the school districts and the schools that they are coming back, that they are making these inquiries, that they are going to satisfy the schools about prices, services and products. That just answers the question, though, of why the defendant would want them. There is evidence in the record that's very clear as to why the schools want them. The schools want the security of knowing that someone has stepped up to the bar and said, I will be there for you. The fact that these aren't legally binding on Jostens' or, excuse me, are not legally binding on the schools doesn't mean that they don't have binding effect on Jostens'. Jostens is the only one that's making binding commitments in these agreements. Is Jostens making any commitments to the price the second year? Jostens is in many cases making commitments about price. There is a blank space on these agreements for remarks. And if one flips through the, in the excerpts of records that have been submitted by Mr. Bleacher, the collection of TSBs, one will see that in a number of cases, not certainly every case, not the majority of cases, but in a number of cases, the schools took the opportunity to have Jostens make a commitment. And often one will see in these commitments, prices will not go up. Prices will be limited to what they were last year. Prices will be kept the same for several years. And in fact, as Judge Carter found, an undisputed finding, schools, although they do not, their primary interest is in the educational mission and making sure the graduation ceremony takes place in a seemingly ineffective manner, they are concerned about the prices that students pay. Judge Carter found that they're concerned that students pay a fair price. Now, it's true, as he found. They don't take on the activity of a public service commission and do a cost of service study and make sure that students are paying the lowest possible price. But that ought not to be required. And I submit it's not required by any of the precedents of this Court or the Supreme Court. Roberts. Well, no, indeed. He found that they use it as a fundraiser so they know the student's not paying the lowest possible price because they want to skim some money off the top, right? Well, as Judge Carter found, particularly with respect to the claim that he did end up projecting on rebates and commissions, the schools do use this, as governmental agencies often do, with implied or expressed taxes to raise funds to do things the state hadn't otherwise armored them with money to accomplish, namely, lots of the activities that surround the graduation ceremony. That conduct, however, was found not to be a basis for antitrust liability. Does this case come down to whether there are barriers and, I should say, plus inability for others to come in and take over the market, if necessary? Judge Fernandez, I will — You're talking a lot about — what I've experienced is that — maybe not, my colleagues may not agree — an exceedingly complex area of whether the schools have antitrust immunity, what the relationship between the schools and the districts in the State of California are, but does one have to get there? No. No, Judge Fernandez. One doesn't need to get there. I thought that was an alternate argument, and that seems to be your main argument, and I'm interested in — That's the main argument in your brief, that the immunity keeps coming up as the number one argument. Immunity is certainly the argument that we think cuts through all of this and is the proper policy argument. We think that the schools of California and the State legislature of California are entitled to more deference than they were given with respect by Judge Carter. And the precedent, not to be said, that puts the schools at risk of antitrust litigation with all the other problems that they have, which is the implication of upholding this decision. If this decision is upheld, the schools don't have that antitrust immunity either. But, Judge Fernandez, I think you're right. The issue comes back to what is the structure of the market and what role do the schools play? On the one hand, we would argue that their role is one that's authorized and delegated by State policy and therefore qualifies Jostens and the schools for Parker immunity. But even if one doesn't reach that issue, it also shows the legitimate business justification to justify the limited restraints that are at issue here. And in the third instance, the relationship and the role of the schools, particularly given that they wear two hats, and one of them is a hat that arms them with concerns about what the students are paying and what service they're getting and what quality they're experiencing, all the sorts of things that the antitrust laws encourage and recognize as valid activities, that if one looks at that, that that is not a barrier to entry that supports a finding of monopoly power. And, in fact, this is not a market that has the indicia of one that has been monopolized. There was no finding of super competitive prices. There was no finding of diminution in quality or service. In fact, the very interesting experiment at the Saddleback Valley Unified High School District, which is reported in the judge's findings, showed that when the epicenter model was adopted and everyone came in and it was a free-for-all, the result was prices were not appreciably lower. That was the finding of Judge Carter. In addition to that, the experience was so unseemly and unacceptable for the school and the parents and the students. The enterprise market system is unseemly. Well, the free market system, if it has if there is a monopolized market and it's supplanted by a free market system, one would expect prices would go down. What one sees here is that the market, in fact, is operating and that there is no monopoly power, that the prices don't go down because they're already constrained by competition, because the schools as gatekeepers are exercising their authority with the dual goals in mind. They're exercising their authority from the standpoint of advancing their educational mission, but they're also paying attention to the competitive considerations that are the ones that the antitrust laws should should laud rather than penalize. At the end of the day, the harm in this case, the alleged harm in this case, comes from a decision made by a State official. These contracts, these agreements, mean nothing. Who's the State official? The State official is a teacher or a principal or a school district official of a public district, which is a political subdivision of the state of California, flowed with authority delegated by the state legislature. And as the policies of the state action doctrine inform us, the federal antitrust laws don't presume that state officials make decisions for anti-competitive reasons or for bad reasons, unless, of course, they have the authority to do so. And if they do, the state official decisions are not going to be second guessed. These are people that Epicenter needs to convince that it is a better competitor than Jostens. And the findings of Judge Carter are that if Epicenter convinces those schools, they will let it pass the gate. They will throw Jostens out the window. They'll also throw Jostens out the window if its competitive behavior falls short of expectations. So this is not a case, we submit, even if the court chooses not to reach the immunity issue where there is monopoly power by any traditional standard, and this is not a case where the conduct rises to the level of what a monopolist should have to engage in in order to violate Section 2 of the Sherman Act. It sets the bar very, very low. This is very near to saying that a company, assumed arguendo to be a monopolist, can be found liable for hoping that someone will face an impediment as long as it continues to perform well. And it practically imposes an impediment for no particularly discernible reason to use these TSPs, is what the district court said, because it knew it would have the effect of making it extremely difficult for any competitor to penetrate the market, and particularly for anyone new to get into the market. What Judge Carter found was that the representatives of Jostens who were asked the question, that these contracts, that these TSP agreements would keep the schools from turning away from your relationship, the answer was yes. That's what we hope for. And one would suspect that any competitor, monopolist or otherwise, would hope that a handshake relationship or any kind of relationship would continue. If I go to the fish market every day and buy from the same vendor. But it didn't stay with a handshake relationship, or it didn't stay with a one-year contract. These long-term TSPs, the judge found, were designed to and did have the effect of discouraging and making it difficult for any new competitor to get through to the students. What Judge Carter found was that a new competitor either had to convince the school that it was a superior option to the existing competitor, or the existing incumbent had to do something that was not good from a competitive standpoint, like raising prices significantly or diminishing its quality or falling down in its service. That doesn't sound like the kind of burden that companies don't face every day in a competitive market. I must tell you, I had to get up extra early this morning to contemplate arguing against Mr. Bleacher, an attorney with an enormous reputation and enormous integrity and ability, and yet I wasn't daunted by that. I took that as a spur to competition. I got up earlier because I wanted to do well. And that's what the Fifth Circuit has said. And, indeed, to continue the analogy, I know this decision will be made by independent State actors, so I'm not worried that the fix is in. Therefore, when you look at what's going on here, I think the reaction should be like the Fifth Circuit's reaction in the Stearns case. The remedy here is the same. I assume you're not interested in rebuttal, but you're over your time. I suspect Mr. Bleacher will leave me with something to rebut. So thank you very much. I will give you two minutes for rebuttal here. I can't please the Court. Maxwell Bleacher, this time for the appellee. I think I will retain Mr. Swanson as my public relations. I'd like to put this appeal a little bit in perspective because it's strange. You have Jostin's with an injunction entered by Judge Carter, yet there's no appeal from the injunction. Part of the injunction has already been executed. They've already written the required letter. And I think we understand the case is about attorney's fees. Thank you. Now, we'll move to Mr. Jostin. It's a practical matter. It's a practical matter. It's about attorney's fees. But you need to understand. But we have a legal issue. I understand. There are other cases where they come up. It's not inappropriate. It's just sort of a backhand way to getting at the attorney's fees. And the point I was leading to is that there's no direct assault on the attorney's fees. They don't come in and say they're too high or that they're too high. That shouldn't and won't influence the Court. I mean, we have an issue, whatever vehicle it comes up through, we have a legitimate antifest issue in the case. And that must please you as an antifest lawyer. Agreed. It doesn't denigrate from your task or from the appeal, but it simply sets kind of a tone for what we're doing here. The principal argument on which Jostin has relied has been State action. And there's four reasons they're wrong on that. And the one that Mr. Swanson failed to talk about today is the threshold question of whether the statute, Education Code 35160, satisfies the Mid-Cal test, which requires that there be an express authorization, an express authorization, that competition is to be displaced. In their brief, Jostin argues that that's not the law, that you can have a foreseeability test. And if the California legislature could foresee that 35160 would lead to anti-competitive results, that's enough. And I suggest to you that this Court struggled with that issue directly in the Columbia Steel Castings case. And the Court expressly, expressly rejected the foreseeability test and referred back to, said they made a mistake in adopting it in the initial opinion. They repudiated that. They adopted the Mid-Cal test. The Mid-Cal test requires express authorization of some anti-competitive act, and that's not here. This statute is nothing more than what Judge Hall called, in the Lancaster case, a do-business statute. It authorizes and relieves the State legislature of having to authorize every specific act done by a school district, but it doesn't envision the displacement of competition and doesn't speak to competition and is totally silent about it. Secondly, it immunizes only school districts, and 97% of the TSPs in this case, by our count, were with schools, not school districts. Third, there is no active supervision, evidence of Jostin's activities. And the law requires, in the case of a private actor, that there be supervision. And finally, the law itself says that it has to be consistent with the conduct of the school, has to be consistent with other law. And the Supreme Court of California in the Hartzell case, which is discussed in our brief, said, struck down an act under the 351.60 as being in conflict with the California Constitution. Here, the act is in conflict with both Federal and State competition laws and shouldn't be allowed to stand. So there's four reasons, but the main one is the threshold issue that this is not a statute that satisfies the Mid-Cal requirement. And if it satisfied the Mid-Cal requirement, it wouldn't apply here because we're dealing with schools, not school districts. Now, on the antitrust issues, which they subordinate because they recognize how overwhelming the findings of fact are in support of the antitrust violation, and we note that they did not attack a single finding of fact is clearly erroneous. So what are the findings that you look to to analyze the antitrust issues? Judge Carter found that the defendant had 75 to 80 percent of the defined relevant market, that the TSPs foreclosed 40 percent of the school districts from competition. He found that this foreclosure lasted indefinitely in response to Judge Brannandy's inquiry. Could they change? Yes, Judge, they could change, but the fact is, if they didn't they wouldn't Yes. We asked Mr. Swanson, could they change, and the answer is, yes, they can, but they don't. And Judge Carter made a finding that they do last indefinitely. That's finding 216. This is a rollover where if you've got three years, it goes each year you sign a new one. Yes, they sign a new one, and it's an evergreen type thing. So it keeps going on and on and on like the bunnies in the door so badly. Counsel, the one thing that troubled me in this case was the fact that the district court made a finding that Epicenter failed to establish the requisite causation. For its own injury, yes. Between the profits and the use of the TSPs. Yes. My concern is, if there is no causation, then how can there be a damage award, even a nominal damage award? Well, he did say at one other point that the TSPs inhibited the competition of both Epicenter and Herff Jones, and I'll find that for you. But that's a separate issue. The issue of causation is separate from the issue of whether or not there is inhibition. Then there must be a finding that the interference caused the damage. Yes. And the court expressly found that there was no causation between the lost profits and the use of the TSPs. And so we're in the worst case, Judge Robinson, you can give them back the $3. You don't need to prove actual causation to get an injunction. You need only to prove the threat of harm in the future. And that's what Judge Carter found, and that's on the basis on which he entered the injunction. But I believe you could discern, despite the clarity of that finding, his concept that these TSPs were for clothing. Counsel, before we leave that, in order to get an injunction, wouldn't you have to have a likelihood of success on the merits? No. In a permanent injunction after trial under the Sherman Act, the plaintiff's obligation is only to prove the threat of possible future harm. And but wouldn't that harm have to be linked to the antitrust action? Yes, but it does not have to flow from the showing of causation. And what's your best case authority for the proposition that the injunction does not have a causation element? Well, it's right in the face of Section 15 U.S.C. 26, says threatened future harm, and I'd have to look at a case because that's an unexpected question to me. I think it's a Supreme Court's decision in Cargill, Cargill v. Monfort, which says you look at the threat of future injury, and you can get an injunction in an antitrust case. It's clear, and I doubt that Mr. Swenson will take issue with me, get an injunction in an antitrust case even though there's been no past harm. Okay. So your position is that regardless of the assessment of damages, the attorney's fees rest on the injunction. Yes. And so the fact that the Court found that there was no linkage in the causation and the damages doesn't impose. That is not only our position. That was Judge Carter's position. He awarded the attorney's fees because he found the public interest was being served by the injunctive relief. I don't quite understand how we are if you say they didn't appeal from the injunction. They did not. So the injunction stands unchallenged, and you say the attorney's fees are based on the injunction, which is not challenged? Then why isn't your argument then that there's the thing you could reach the conclusion. That's where I started out. But you kind of said I was writing the wrong horse, so I got off. But I was starting out to suggest to you that if they have an appeal from the injunction and the attorney's fees are tied to the injunction and we're really here indirectly attacking the attorney's fees, the question is whether or not this appeal is moot. And is that your argument, that it is moot? I mean, to say there's a question. Did you argue that there's no. We did not assert that because, frankly, having researched it, we came away confused because the Supreme Court, there's a Supreme Court case under which we'd win, but there's a Ninth Circuit case under which you would probably find it's not moot because the attorney's fees is an independent right. And so we decided to abandon the argument of mootness, but it is – it does suggest itself as a practical matter that in this case. Well, it's either moot or it isn't. I mean, if you're not contending it's moot, I don't know what. No, we're not contending it's moot. Okay. Back where we started. All right. So we have a market foreclosure that lasts indefinitely. The judge found, and there is great evidence in this case, that they intended these contracts to operate just the way they did. Both northern and southern division managers for Jostens testified that the contracts were intended to be used for close competition and to give the school districts a vehicle for rejecting importuning of competitors, and that they served that purpose. And then the judge found, consistent with Judge Kuczynski's opinion in United States v. Sayoufi, that a network of contracts or distribution arrangements which are designed, and that's what these were, designed to lock out potential competitors can constitute, quote, in his words, a structural barrier to entry into the market. And with due respect to Judge Kuczynski, I don't think he invented that. Judge Brzezanski made the same finding in the United Shoe Machinery case years earlier. The Supreme Court made the finding that a series of contracts can have a preclusion or effect in the Paramount Pictures block booking case and so on. And most importantly, and there's really no answer to this, the Seventh Circuit in the Balfour case, on which Judge Carter and Epicenter relied, reached the conclusion that contracts of the exact same nature, not legally binding, used by a company which had only 17 percent of the market, but and therefore foreclosed 15 percent of the market, it had 17 percent, used the contracts in 85 percent of the schools, so there was only a market foreclosure of 15 percent. And the Seventh Circuit found that level of foreclosure to be adequate. This Court in the Twin Cities Service case, looking at exclusive dealing contracts, condemned arrangements which effected only 24 percent of the market. And most recently, the same device, a series of contracts used to exclude competitors, was condemned resoundingly by the Eleventh Circuit in the Telecorp versus Southwestern Bell case, which we cite in our reply brief as it came down around that time. So you have here monopoly numbers in the market share, a more than enough level of market foreclosure, foreclosure which lasts indefinitely. You have these contracts acting as an entry barrier that they were intended to foreclose competition. And all of this, if you're honest, please, in the market of, in the context of a duopoly market in which Judge Carter observed there was an absence of price competition. And Jostin's market share had remained relatively constant over a long period of time. It's true that Herff Jones' market share grew, but it grew because Balfour exited the market and Herff Jones picked up most of that market share. So if you drew a chart of the two companies who dominated the market over the last 10 years, you would find very little movement at the Jostin's level. It remained at 75 to 80 percent of the market. And you can get the impression that if market shares don't change over a long period of time, these contracts are doing their job because they're precluding entry into the market. Epicenter couldn't make it. Balfour exited the market. And Herff Jones' only significant improvement is to take Balfour's share of the market and to grow very little over a 10 year span, such as not to threaten either by price competition or market accumulation the monopoly position which Jostin's occupied. And so the bottom line here is that you do have all of the elements of monopoly carefully found by the judge in his lengthy and scholarly opinion. And there is no basis for, it seems to us, no basis to challenge the finding that there has been a deliberate act intentionally calculated to foreclose competitors and that it worked. He finds that the competitors have been foreclosed. He finds that this did impact both Herff Jones and Epicenter's ability to penetrate the market. Therefore, he finds that there has been the required deliberate act. He makes all of the required findings, none of which are challenged. Now the defendant comes along and says, oh, but we offered a pro-competitive business justification. Well, not very much. Not very much of the trial was spent on pro-competitive business justification. But Judge Carter tackles that again in his decision. And he concludes that, that there is weighing that pro-competitive justification, which is helpful to the schools, doesn't do anything for Jostin's, doesn't reduce their cost, doesn't facilitate delivery, doesn't do anything. They couldn't show what its purpose was other than the testimony that it was a foreclosure. In effect, it kept competitors out. So he weighs this, as he's bound to do as the fact-finder, under the laws enunciated in Judge Beazer's opinion in Image Tech. He says business justification is a factual issue for the jury to weigh the pro-competitive benefits against the anti-competitive benefits and conclude. Judge Carter did that. He did that in his findings. And he found that the anti-competitive – he expressly made a finding the anti-competitive effects outweigh the pro-competitive effects. That's a fact-finding, no challenge to the fact-finding, and therefore we have no competitive business justification. So the bottom line is that we have all of the elements of an antitrust violation in place. We have no business justification, and the decision below should be affirmed. Of course, there's one argument we just need to touch on, and that is he also found that the same practices violate 172 of the – 17200 of the Business and Professionals Code of the State of California, and that the relief that we sought was justified under that. Well, let me ask you about that, Mr. Bleacher. As I understand it, he only reached the question of whether, in the making of the determination under Section 17200, he only reached the determination that it was because it was a violation of Section 2, it was also a violation of Section 17200. Now, because Section 17200 is a lot broader than Section 2. It includes unfairness. It includes violations of other laws. It doesn't have to be Section 2. But he didn't go beyond Section 2. I believe if you look at Findings 262 through 267 and read them as an interlacing text, he does, Judge Reinhart, say, one, I find this to be a violation of 17200 because it violates Section 2 of the Sherman Act. But he goes on beyond that, and he makes findings from which you could determine that the practice were independently unfair. And he stated that in numerous places that there was harm to consumers and that the – if you look at 262 to 267, you'll see that he makes it what we consider to be an unfair violation of Section 2 of the Sherman Act because it violates Section 2 of the Sherman Act. He says that the conduct was unfair within the meaning of 17200. The defendant, surprisingly, makes the argument that we didn't raise this below, but in footnote 9 in our brief, we tell you the umpteen times throughout the summary that we have an independent right to win under 17200. Now, he did not – He did not – to touch on the untouchable, he did not, however, say that you got attorney's fees under that section, did he? That is correct. And we didn't ask for them under that section. And that is a slightly – and it requires a slightly different alchemy than does antitrust, does it not? It does, but I tell you he made the finding repeatedly in Section – in 271 and 222 and 236. Each one of those, he talks about the harm to competition and the harm to consumers. And 1021.5 of the Code of Civil Procedure says, if you find a case in which there's a harm to consumers, and – And you're saying that the defendant was dead under 17200, but not of Section 2. Where would you be on the attorney's fees if you didn't request them under 17200? Well, you need to decide that. The defendant says we're dead, and they cite two cases, and I'm going to talk to you about those now that you've raised that. We say in this case, the judge made an express determination, it was the very last finding he made, that the plaintiff's – he said the plaintiff's – his finding in 271, as I recall, plaintiff is awarded reasonable attorney's fees and costs. Now, he doesn't say under what. He just says we're entitled to fees. So I say to you the fact that we didn't ask him for fees under 1021.5 doesn't preclude us, since he awarded fees, from your remanding it back for his determination of whether he would award fees under that section. Was the fee request made after he – Yes. After what? And we just didn't do it. After what? It was made after the – After he had ruled that it was a Section 2 violation? Yes, and a Section 17200. And we simply confess there we relied on the Section 2 finding and did not do a 1021.5 request. Now, the defendant cites you a Ninth Circuit decision in a case called Swanson. But in Swanson, this Court said in reviewing the district court's denial of attorney's fees that the court didn't err in denying it and it was too late to raise a new ground for the award of the fees on appeal. I agree with that. The California case they cite, Snyder v. Marcus and Millichamp, is exactly the same. The trial court denied fees because the party seeking them wasn't the prevailing party. And on appeal, they developed some new idea. And the court of appeals in California first said, well, you can't raise this, and then they said even if you could, you're wrong. But my point is, in both cases, the district judge denied the request for attorney's fees, evidencing the intent that the no fees be awarded. Judge Carter made an express finding at 271 that we were entitled to fees, and our error in not co-joining CCP Section 1021.5 should not now bar that award as a minimum. I would urge the Court, in the interest of fairness and justice, to remand that question back, if you found no Section 2 violation, but you found the 170-200. I say fairness and justice would require and would not be inconsistent with any decision in the past to remand that back to Judge Carter for his determination as to whether the fee award was also justified under 1021. Counsel, before you conclude, when I asked you before about the causation, you said that on the face of the statute that governs injunctive relief, there is no reference to causation or damages. Threatened future harm. I'm quoting it by memory because I've read it so many times. Yeah. Does it not talk about threatened future harm? It says against threatened conduct that will cause loss or damage, which seems to lead us right back to the causation. In the future, the case law makes it very clear that there are two separate standards. For damages, there must be past caused antitrust-caused injury. For an injunction, there need be no past caused antitrust-caused injury. Right. But future, there still has to be, it appears, threatened conduct that will cause loss of damage. So there is still a causation of loss of damage element in the injunctive portion of the statute, it appears to me. Yes. There still has to be a linkage in terms of causation. And where was that shown for purposes of injunctive relief? Well, his finding that there was no causation was that based on the point of being new in the industry and it being undercapitalized and it required a considerable period of time. And being obnoxious. And being obnoxious and to break the barrier down. So he said, if I look backwards, these contracts are not the cause of the plaintiff's injury. The cause of the injury. What about looking forward? What finding did the Court make regarding looking forward in terms of causation? Well, in doing the – I'll answer that in a moment. The Court has no doubt, I'm reading from 259 of the findings, that the TSPs were intended to, and to some extent have foreclosed competition at the schools which are parties to the agreement. Okay? What about looking forward, though? I know in the – in writing up the injunction, he made a – he says this is in his denial of a stay pending the appeal, that Jostens possessed monopoly power and its use of the total service agreements amounted to an anti-competitive act and was found to constitute an unlawful business practice in violation. That's fine, counsel. I just wanted you to point out in the findings where there was a causation for the future. Oh, here. This is – I don't have the record page, but in denying the motion for a stay of injunction, it is not clear that the stay will substantially injure Epicenter's interest, as the Court found that much of Epicenter's failure to succeed in the industry was a result of Epicenter's timing and tactics. The public interest, however, clearly lies in favor of denying the motion for stay, and then he talks about again how these were anti-competitive. So he's leaving open the fact that there's – I understand your point. You can – you can succeed in the future. Are there not cases, was it the NFL versus the – Yes. In New York, the Second Circuit, on a similar $1 award, gave the plaintiff's The issue is when it's the conduct of the plaintiff that contributes in large part to the fact that you don't get damages, the courts – and I think that was not the only case – still find that there is a violation, even though the plaintiff's own conduct is largely responsible for his failure to succeed. They still find enough of a violation to give a dollar and an injunction and attorney's fees. Yes. Are there other cases other than the NFL case? The Roseboro Cement case, the cemetery case, which we cite. And there are others in which nominal damages have been awarded, and I don't think today anybody – The reason for nominal damages is that you haven't been able to prove the causation for your other damages, whatever they may be. But that's why I believe you get nominal damages. The answer is if you can't quantify injury, quantifiable injury, you don't get any damages, but that doesn't mean you haven't been injured in the – from the anticompetitive acts. But, counsel, do those cases have an express finding of a lack of causation, though? The NFL case clearly did. They found that the AFL, the World Football League, shot itself in the foot. So the jury made an express finding that they were the cause of the injury, but they found there was an antitrust violation and awarded them $1, and the Second Circuit affirmed an attorney's fee award in that case of $5 million. Is that the USFL versus NFL case you're talking about? Yes, Your Honor. I'll read that. Thank you. Yes, Your Honor. Thank you very much. Picking up on the last point raised by Judge Rawlinson, the law is clear that a finding of injury in fact is an element of liability, that the failure to prove injury in fact, causation of injury in fact, denies a plaintiff the right even to nominal damages, that under Cargill, in order to obtain an injunction for the future, some concrete threat of actual injury in the future must be found, and none of those elements were found by Judge Carter below. At paragraph 244, Judge Carter said, in fact, in spite of these limitations, Epicenter has done surprisingly well, and has shown that it is able to compete in the Orange County area. He says, for the size of Epicenter's staff, it is generating equal or greater revenues than David Albright, one of Jostin's top sales representatives. At paragraph 246, he says, Although there was testimony that plaintiff was rebuffed by school administrators citing the TSBs as an excuse, there is no evidence that Epicenter would have made greater inroads in the relevant market in the absence of the TSBs. There is no finding by Judge Carter of the fact that Epicenter will suffer concrete damage in the future absent an injunction. So I believe the causation issue is a limitation. What he says about the causation is not that there wasn't cause for some injury, but that they have been unable to establish the amount of the lost profits, is what he says in 246 and 247. He says, Nominal damages are appropriate for an antitrust violation where the profit record of a recent entrance would have required guesswork and speculation. And that immediately follows 246, where he says, You can't tell the extent to which they're injured. Respectfully, Judge Reinhardt, I would submit that Judge Carter found nominal damages without making a finding of actual injury or of threatened future injury. And that ties back to the other arguments that we've made. Mr. Bleacher has diminished them, and we take exception to that. Yes, we did put state action up front. Yes, we do think it cuts through this entire case. But we think our other arguments are very powerful, very compelling, and supported by extremely relevant authority. And we do argue that there is no monopoly power, that there is no antitrust injury, and, of course, causation must not just be of any kind of injury. It must be of the type that the antitrust laws were enacted to prevent, higher prices, lower quality, none of which were shown in this case. We do think that the arguments that we've raised on legitimate business justification and the absence of wrongful conduct are all very powerful. And we certainly assert that those arguments must be reached, and all of them must be rejected in order to affirm the decision below, which we think should not happen. We have appealed the injunction. I am stunned and unable to explain why Mr. Bleacher thinks otherwise. I just looked at the notice of appeal. This is not a case about attorney's fees. Jostens is a company that has a hundred-year reputation. It deals with public officials day in and day out. Is the injunction period over yet? The injunction is five years. So the injunction is certainly not over yet. We have a reputation that is of great concern to us. It's of great concern not to be branded a monopolist as we deal with public officials throughout the country. And, of course, the collateral consequences of being found to be a monopolist are known to companies less powerful than Microsoft's of the world. And there is no reason why this judgment should be affirmed if there is no legal basis for it. It's not a matter of attorney's fees. Mr. Bleacher mentioned that the judgment could be rescued on the basis of 17-200. Judge Reinhart, as you pointed out, Judge Carter found only that there was a violation of 17-200 for this conduct based on the fact that it was unlawful under Section 2. Mr. Bleacher didn't ask and certainly didn't petition the Court to have an additional finding of unfairness under CELTEC. And certainly the CELTEC decision indicates that for a competitor to establish a violation of unfairness, a violation under 17-200, one needs to show an injury, a violation of the sort that violates the spirit of the antitrust laws. And it seems to me that in finding 263 or under California unfair competition laws, he does at least talk about CELTEC and he does talk about conduct that's not fair. Yes, Judge Fernandez. He clearly reached the unfairness issue under CELTEC with respect to all the other conduct as to which he had rejected a Sherman Act finding of liability. Now, it was certainly incumbent on Mr. Bleacher if he wanted a separate finding to be made on unfairness grounds as to TSP to ask the Court to make that finding. That request was not made. This judgment was rendered. It rests on one ground. It certainly can be seen, I think, legitimately to rest on that ground only because if that Section 2 violation is not upheld, it makes no sense to find an unfairness violation here. And that, of course, would be for the district court to do in the first instance. But this Court can certainly see and rule that if Section 2 is not sustainable, then there is nothing about this practice that offends the spirit of the antitrust laws. Well, I thought that the Midwestern case, whatever that other company, where they invalidated similar TSPs, was not based on Section 2, but was based on a different violation. Judge Reinhard, that is the Balfour case. Yes, the Balfour case. Which, Mr. Bleacher mentioned, it's a 1971 case of the Seventh Circuit, and I certainly commend the cases of the Second Circuit to this panel on these issues generally. But with respect to that one, which is a 30-year-old decision that rests on Section 5 of the FTC Act, it pertained to an order found by the FTC which expressly rejected a Section 2 basis, a monopolization basis for upholding the Section 5 violation. The Seventh Circuit, in looking at this, and by the way, these were agreements that were at issue in the Balfour case where the school directly contracted to buy the graduation products. They were not a gatekeeper. They were actually buying the products in that case. That's not the case here. Secondly, the Seventh Circuit said we can't even affirm this on the basis that there's a Section 3 violation here, that there's a violation of Section 3 of the Clayton  Act. Now, the Supreme Court told us 40 years ago in Tampa Electric that if you can't establish a violation of Section 3 of the Clayton Act based on alleged foreclosure, you're certainly not going to get to the goalpost on Section 2 of the Sherman Act. And so all that Balfour case says is that in 1971, the FTC Act was read to allow the FTC to prohibit practices that had such a minimal foreclosing effect that they don't even rise to a level, to the level of a violation of a prophylactic statute like Section 3 of the Clayton Act. So those are known as unfair as opposed to unlawful practices. Well, Section 5 of the FTC Act, of course, is administered by the FTC with reference to antitrust principles, and that's the point the California Supreme Court made with respect to interpreting 17200, the analogous portion. And that's why the California Supreme Court said we look at antitrust principles and deciding whether or not something is unfair when the plaintiff is a competitor. And that's the case here. The plaintiff is a competitor. Thank you, counsel. Thank you both very much. Oh, Mr. Gleeson, you're the – no, you're the – Kelly, I'm not used to seeing you as clerk. I just want to give Judge Longstreet these citations. All right. Give them to the clerk. You can give them to the clerk. Thank you. Thank you both for an excellent argument. We appreciate it. And the Court will stand in recess for the day.
judges: Reinhardt, Fernandez, Rawlinson